J-S45031-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.E.S., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.B., MOTHER | : | No. 752 EDA 2017 |

Appeal from the Decree January 26, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000045-2017,
CP-51-DP-0002357-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: N.D.H.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.B., MOTHER | : | No. 756 EDA 2017 |

Appeal from the Decree January 26, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000046-2017,
CP-51-DP-0002358-2015

BEFORE: GANTMAN, P.J., PANELLA, and STRASSBURGER[*], JJ.

MEMORANDUM BY STRASSBURGER, J.:                    **FILED AUGUST 21, 2017**

D.B. ("Mother") appeals from the decrees entered January 26, 2017, in the Court of Common Pleas of Philadelphia County, which terminated involuntarily her parental rights to her minor children, A.E.S., Jr., a male

---

[*] Retired Senior Judge assigned to the Superior Court.

born in July 2007, and N.D.H.B., a female born in February 2015 (collectively, "Children").[1] We affirm.

The trial court summarized the factual and procedural history of this matter as follows.

> The family in this case became known to [the Philadelphia Department of Human Services ("DHS")] on July 21, 2015, when a DHS social worker visited the family home with a Family Empowerment Services provider and met with the family. Children's sibling ("Sibling") told DHS that she was afraid Mother would hurt her, but then recanted stating that she was not afraid of Mother. Sibling also told the social worker that Mother cut Sibling's hair short because she punched [A.E.S., Jr.,] in the face. DHS learned that [A.E.S., Jr.,] was diagnosed with autism and attention deficit hyperactivity disorder ("ADHD"). Mother signed a Safety Plan agreeing to have in-home services implemented through a Community Umbrella Agency ("CUA"). On July 25, 2015, in-home CUA services were implemented in the home through Turning Points for Children ("TPC"). On July 30, 2015, CUA went to the family's home to meet with [A.E.S., Jr.,], who told them that Sibling had stabbed him with a pencil that day. [A.E.S., Jr.,] also showed CUA a healed bruise on his chest and stated that Sibling had also stabbed him around 2013. Mother informed CUA that she had telephoned Intercultural Behavioral Health for Sibling's mental health and had not taken her to the Crisis Response Center ("CRC"). CUA visited the home on August 5, 2015, where they observed that Mother did not have any baby formula for [N.D.H.B.] and Mother informed them that she had received a Notice of Eviction for which she will

_____

[1] The trial court entered a separate decree that same day, terminating the parental rights of A.E.S., Jr.'s., putative father, A.E.S. A.E.S. did not file a brief in connection with this appeal, nor did he file his own separate appeal. The court did not conduct a termination hearing with respect to N.D.H.B.'s putative father, E.W., due to the unavailability of his counsel. On March 10, 2017, the court entered an order continuing the case with respect to E.W., indicating that he intended to relinquish voluntarily his parental rights to E.W.

need to attend a court hearing. On August 6, 2015, CUA went to Mother's home and observed that Sibling had a black eye and scratches on her lip; Sibling told CUA that she fell outside. Mother agreed to have Sibling undergo a mental health evaluation; to sign consent forms allowing CUA and DHS to obtain the results of the evaluation; and to have [A.E.S., Jr.,] evaluated at the Center for Autism. On August 10, 2015, CUA went to Mother's home and observed that she did not have baby formula for [N.D.H.B.] in the home. Mother agreed to go to Women, Infants, and Children ("WIC") to obtain baby formula. Mother and CUA arranged for CUA to transport Mother to WIC to obtain the formula. On August 11, 2015, DHS received a General Protective Services ("GPS") report which alleged that Sibling stated that Mother hit her in the past; that Mother stated she does not physically discipline Sibling; that Sibling has a history of physically assaulting [A.E.S., Jr.]; that Mother has a history of mental health issues; [and] that Mother and the father of [A.E.S., Jr.,] and Sibling both have histories of domestic violence. The report was determined to be valid. On August 13, 2015, CUA arrived at Mother's home to transport her to WIC as previously arranged, but no one was home and Mother did not answer the phone when CUA called. On August 14, 2015, Mother informed CUA that she had received a Notice of Eviction via [the] United States Postal Service ("USPS") and admitted that she had not taken Sibling for a mental health evaluation. DHS learned that between August 14, 2015, and August 19, 2015, the Center for Autism called Mother three different times, but Mother did not answer any of the telephone calls. On August 21, 2015, DHS went to Mother's home where Sibling told DHS she was afraid of Mother; that Mother had hit her while she was in the shower; and that Mother had a history of choking her. Mother told DHS that Sibling had been acting inappropriately towards Children. DHS observed Mother's landlord serve her personally with an eviction notice stating that Mother had to vacate the home by August 31, 2015.

On August 21, 2015, DHS obtained an Order of Protective Custody ("OPC") for Children and Sibling. ... Children were placed in a foster home through TPC and Sibling was transported to Belmont Behavioral Health, where she was accepted for inpatient mental health services. At the shelter care hearing on August 24, 2015, the OPC was lifted and the temporary commitment was ordered to stand. On August 31, 2015,

- 3 -

Children and Sibling were adjudicated dependent and fully committed to DHS....

Trial Court Opinion, 4/11/2017, at 1-3.

On January 10, 2017, DHS filed petitions to terminate Mother's parental rights to Children involuntarily. The trial court conducted a termination hearing on January 26, 2017. Following the hearing, the court entered decrees terminating Mother's parental rights. Mother timely filed notices of appeal, along with concise statements of errors complained of on appeal.[2]

Mother now raises the following questions for our review.

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, D.B.[,] pursuant to 23 Pa.C.S. [sub]sections 2511(a) (1), (2), (5)[]and (8) where evidence was presented at the trial that she completed several of her goals and was living in a domestic violence shelter where she tried to perform her parental duties[?]

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, D.B.[,] pursuant to 23 Pa.C.S. [sub]sections 2511(b) where evidence was presented that established [C]hildren had a close bond with their Mother and the[y] had lived with their Mother for the most part of their

_____

[2] In her notices of appeal, Mother included the docket numbers for both Children's termination and dependency matters. In addition, in her concise statements of errors complained of on appeal, Mother indicated that she was challenging both the termination of her parental rights, as well as the orders changing Children's permanency goals to adoption. However, Mother does not include a challenge to any goal change orders in her brief on appeal. Further, we observe that the trial court's dependency orders, entered January 26, 2017, do not actually contain language changing Children's permanency goals. Thus, we address only the decrees terminating Mother's parental rights.

lives[?] Additionally, Mother consistently visited with [C]hildren for the entire time [C]hildren were in placement.

Mother's Brief at 7.

We consider Mother's issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subsection] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subsection] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature

- 5 -

and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to subsections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of 2511(a), as well as subsection 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under subsection 2511(a)(2) and (b), which provides as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511.

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to subsection 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the trial court found that Mother is incapable of parenting Children, and that she is unable to remedy the causes of her parental incapacity. Trial Court Opinion, 4/11/2017, at 10. The court emphasized that Mother failed to comply with her Single Case Plan ("SCP") objectives. *Id.* at 10-11. In response, Mother argues that she has "substantially completed" her SCP objectives pertaining to parenting classes and domestic violence, and that she visited with Children consistently. Mother's Brief at 14-15. Mother argues that she is now capable of providing a safe home for Children. *Id.* at 15.

Our review of the record supports the trial court's findings. During the termination hearing, DHS presented the testimony of CUA case manager, Joanna Pecora. Ms. Pecora testified that Mother's SCP objectives included "[m]ental health, parenting, autistic parenting, housing, visitation, healthy partnerships, anger management, domestic violence as a victim and perpetrator, budgeting, and at the last court hearing we asked for three random drug screens as well." N.T., 1/26/2017, at 13. Ms. Pecora reported that Mother was invited to participate in her SCP meetings, but did not attend. *Id.* at 16. When presented with SCPs for her review, Mother "would usually either rip them up, throw them back at staff, or just say that she wasn't doing them." *Id.*

Concerning Mother's progress in completing her SCP objectives, Ms. Pecora rated Mother's compliance as "[m]inimal." *Id.* at 17. With respect to mental health, Ms. Pecora testified that Mother "had an intake appointment ... and she never completed any of her intake." *Id.* at 15. Mother also was hospitalized for five days in November 2016 due to mental health concerns. *Id.* As for Mother's parenting objective, Ms. Pecora testified that Mother completed a parenting class. *Id.* However, Mother failed to complete a parenting class that was autism-specific. Ms. Pecora explained that CUA offered Mother a weekly online autism-specific parenting class in their office, starting in September 2016, but that Mother appeared for only three sessions, all in December 2016. *Id.* at 14-15. Relatedly, Mother does not attend A.E.S., Jr.'s, autism treatment plan meetings. *Id.* at 19. When Ms.

Pecora provided Mother with an evaluation pertaining to A.E.S., Jr.'s, autism, Mother "ripped up the evaluation and stated that he was not autistic." *Id.*

Concerning visitation, Ms. Pecora testified that Mother attends her visits with Children consistently, but that visits were reduced from weekly to biweekly due to her inappropriate behaviors. *Id.* at 17-18. Ms. Pecora explained that she did not supervise any recent visits between Children and Mother, because "[s]he threatened my life." *Id.* at 18. In addition, Mother completed a budgeting program, but she failed to complete a healthy relationships program or an anger management program. *Id.* at 15. Ms. Pecora did not know if Mother was receiving any domestic violence counseling or services. *Id.* at 18. Mother was referred to the Achieving Reunification Center for housing, but she declined services and was discharged unsuccessfully on three occasions. *Id.* at 14. Currently, Mother claims that she resides in a domestic violence shelter, but refuses to provide CUA with the name of the shelter or where it is located. *Id.* at 18. Ms. Pecora testified that Mother failed to submit to random drug screens. *Id.* at 13. Mother participates in drug and alcohol treatment, but her participation began only recently, in December 2016. *Id.*

Thus, the record confirms that Mother is incapable of parenting Children, and that Mother cannot, or will not, remedy her parental incapacity. Mother has failed to comply with her SCP objectives to any significant degree, and refuses to cooperate with service providers. Children's lives should not be put on hold any longer, when it is clear that

Mother will not be capable of caring for them at any point in the foreseeable future. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

We next consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to subsection 2511(b). We have discussed our analysis under subsection 2511(b) as follows.

> [Subs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subsection] 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the trial court found that Children are not bonded to Mother, and that terminating Mother's parental rights would not destroy an existing beneficial relationship. Trial Court Opinion, 4/11/2017, at 16. The court emphasized, among other things, that Children have positive relationships with their respective pre-adoptive foster families. *Id.*

Mother argues that terminating her parental rights would not serve Children's needs and welfare, because Children have resided with Mother for most of their lives and are bonded to her. Mother's Brief at 17.

Once again, our review of the record supports the trial court's findings. Ms. Pecora testified that Children reside in pre-adoptive foster homes. N.T., 1/26/2017, at 19-22. A.E.S., Jr., has resided with his pre-adoptive foster parent since November 2016. *Id.* at 19-20. A.E.S., Jr., "likes his foster parent and has actually been included in family portraits and things like that with the foster family." *Id.* at 20. N.D.H.B. has resided with her pre-adoptive foster parents for nearly a year and half. *Id.* at 22. N.D.H.B. is bonded with her foster parents and calls them "mom and dad." *Id.* Concerning Children's relationship with Mother, Ms. Pecora testified that A.E.S., Jr., has refused to attend some of his recent visits, "because he is tired of his mom telling him that she's going to bring him toys, ... or just promising him different things that she would bring and she does not bring

those." *Id.* at 20-21. In addition, N.D.H.B. does not hesitate to leave Mother and go to her foster parents at the end of visits. *Id.* at 22. Ms. Pecora did not believe that there would be "any impact" on Children if Mother's parental rights were terminated. *Id.* at 24-25.

The trial court also heard the testimony of CUA visitation coach, Quincy Marshall. Mr. Marshall testified that he has supervised Mother's visits with Children since July 2015. *Id.* at 27. He described Mother's visits with Children as follows: "at times, [M]other interacts well with them. She engages in activities with them. But the majority of the visits have been ... inappropriate and I noticed that the [C]hildren have altered their wording. They're hesitant when they're engaging with her because they're afraid to maybe displease her." *Id.* Mr. Marshall explained that Mother arrives "a bit upset" at every visit with Children, for reasons that have nothing to do with the visit. *Id.* at 28. Mother sometimes yells at Children, which has been a "major concern." *Id.* at 28-29. Mr. Marshall reported that, in the past, A.E.S., Jr., had difficulty separating from Mother at the end of visits, but that he does not have this difficulty anymore. *Id.* at 29. N.D.H.B. has no problem separating from Mother at the end of visits. *Id.*

Thus, the record confirms that terminating Mother's parental rights would best serve Children's needs and welfare. As discussed above, Mother is incapable of parenting Children, and will not be capable of parenting Children at any point in the foreseeable future. Children are in pre-adoptive foster homes, and terminating Mother's parental rights will allow Children to

achieve permanency. N.D.H.B. is bonded with her pre-adoptive parents, while A.E.S., Jr., is developing a positive relationship with his pre-adoptive foster parent. Further, the record does not reflect that Children have a significant bond with Mother. A.E.S., Jr., struggled to separate from Mother in the past, but no longer does so, and has even refused to attend visits. N.D.H.B. was approximately six months old when she was removed from Mother's care, and has no difficulty separating from Mother at the end of visits.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by terminating Mother's parental rights to Children involuntarily. Therefore, we affirm the trial court's January 26, 2017 decrees.

Decrees affirmed.
Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/21/2017